The 4th District Appellate Board of the State of Illinois has reconvened. The Honorable Peter T. Chabot will preside. Thank you. Please be seated. The next call, 4-23-0014, Gary Matthews Appellant, City of Peoria, et al. Police. Counsel for the Appellant, please state your name. Christopher Lang. Thank you. For the Appellate? John E. Ryan. Very well. Mr. Ryan, you may proceed. Thank you. May it please the Court and Counsel, again, I am Christopher Ryan, representing both Mr. Matthews and Mr. Brannon in this case. There are three issues in this case. We appeal, essentially, raising a law of the case issue and a statute of limitations issue, and the Appellant raised a standing issue, which I will address since she raised it, even though I don't believe it's necessarily part of this appeal. On the law of the case, I'm going to cut through some of the issues and get right to the point on this. We were never arguing that the ruling of Judge Hoos was final to the extent that it could never, ever be modified. And, in fact, in Patterson v. Burge, which we cited in this court, they said that even in a law of the case situation, that merely expresses, this is a quote, merely expresses the practice of the courts generally to refuse to reopen what has been decided. It is not a limit on their power. So a subsequent judge can always overturn the prior judge. But in this case, Judge Hoos made it clear that not only was she ruling on the statute of limitations, she wasn't just denying their motion to dismiss. She said, I don't want you to come back on this unless something changes in the complaint. And she said she agreed with our position and our cases that the statute of limitations did not occur until the hotel was lost. I'll get to that in a moment. But my point is, there's been some argument, well, that's not a final order. Well, when I read the cases, I see two different things. They say final, but yet cases like McDonald's Court v. Recy say, well, when the tenants defaulted and there was a ruling on that, even though they had decided damages, even though there were other issues to decide in the case, that ruling on the default was final for the purposes of an appeal. In this case, I don't think there's any question that if Ms. Nair had said, I don't like Judge Hoos' ruling, I'd like a 304A finding and take it up, that would have been unopposed and she could have come up on that because the way that was ruled on, the court was saying, I think the statute of limitations runs on this date. And I'm not going to change that unless something changes in the complaint. And for the purposes of this case, all I'm saying is, nothing changed in our amended complaint pertinent to the statute of limitations. No operative facts changed. And when the court actually questioned Ms. Nair on that, she said, well, it changes our understanding, but she never pointed to any paragraph which somehow changed the calculus on statute of limitations. I don't think our case rises and falls on this issue, but I'm pointing out that the trial judge here did not even look at Judge Hoos' ruling. He did not distinguish what she said. He did not distinguish the cases. He merely accepted their argument and moved on. Turning to the statute of limitations, we cited several cases which I believe are directly on point. Chandra versus North Park Elementary. There were a series of wrongful acts by a municipality which led to the issuance of a demolition permit. There were discrete wrongful acts alleged down a chain. And finally, a permit for demolition was given and a house was demolished. They said the statute of limitations did not run until the demolition of the house. Not in the issuing of the permit, not in these other things. Bank of Ravenswood, that's one of our central cases. That case specifically says, where a tort involves a continuing or repeated injury, however, the statute of limitations does not run until the date of the last injury or where the tortious acts ceased. That case also cites Rock Falls, which is another case where that quote is taken out of. Patterson versus Burge, we cited 17 years of prosecutorial misconduct against the prisoner. But he did not know exactly what was going on until he was pardoned and all this information came out. That's what triggered the statute of limitations, not these 17 years of discrete wrongful acts. Romano versus Morrison, an attorney malpractice case. They said it's not the fact that the attorney missed the statute of limitations. It's not the fact that there was an initial ruling that he missed the statute of limitations.  That's what triggered the statute of limitations. That's when the loss occurred. In this case, tracking the complaint, in paragraph 16, August 31st, we say the city terminated the redevelopment agreement. They insisted on becoming a mortgager. They jumped ahead of other lien holders. We said it increased the debt load, but there's no discrete damage. There's nothing we could have done at that point, no suit we could have filed at that point. We talked about the second amended development agreement. They got more rights. They got more rights than the prime mortgager. They insisted on putting more terms in there that interfered with the intercreditor agreement. There were complaints about that. Exhibit G, the management agreement, that was a novel agreement. The city could not unreasonably refuse changing management, as I'll tell. When Marriott was performing poorly, they said, if you want us to get rid of Marriott and bring in a well-known hotel manager, you're going to have to sign this extra agreement with all these extra requirements and all these extra things. Obviously, those were all problems, but could we have filed a suit at that point? Maybe, but what would our damages have been? We still owned the hotel. We were still operating the hotel. I don't want to jump in and put you off track with regards to the current argument, but what about these agreements and your party or your client was an agent or an actual party to the agreements? Okay, you're talking about the standing issue? Yeah, I'm trying to get onto that issue. Well, first of all, and this is what the trial court judge got a little confused on this, and we decided not to push the contract claims precisely because it was very confusing, but originally we had corporations. They were all redone. A complete new set of corporations was formed for the purposes of the historic tax credits. As a result, Gary Matthews found himself sole shareholder of a number of essentially shell corporations that were housed to formulate the specific form that the historic tax credits had to take in order to get approval for that, and this was a specific portion of financing. But all of those corporations flowed eventually, and the developers fee all flowed into one of Gary Matthews' personal corporations that he was the sole owner of, but as I pointed out in the brief, he signed the redevelopment agreement and the amended redevelopment agreement and the second amended development agreement not only as owner, but he was required to personally guarantee the operations corporations, and he signed personal guarantees. That's on paragraph 8.6 of that agreement. It said he personally guaranteed all of the conduct of those corporations. The developer fee was known to the city as being owned by Matthews and Brannan, and they required them to subordinate that when they came in as a mortgager. Matthews personally guaranteed the mortgage and was sued when the mortgage came in. The city sought to bind both Matthews and Brannan in the side letter, and Gary signed it. Mr. Brannan did not sign it, but he reportedly found both of them. In paragraph 11 of the complaint, we talk about Matthews as the guarantor of the enduro and quarter agreements. Those were the prime mortgager and one of the contractors. There was a personal claim in bankruptcy by the city against Mr. Matthews and Mr. Brannan arising out of their management of the hotel. Exhibit F, Deutsche Bank agreement. The developer's fee would have been free from everything but the prime mortgage of Deutsche Bank at that point, along with some of the other investors. So there were all sorts of things that flowed both to the developer's agreement owned by Matthews and Brannan and all sorts of personal guarantees placed in there. Both of these gentlemen were brought into the bankruptcy of the corporations. Both of these gentlemen personally went bankrupt. Both of these gentlemen were sued by the city in bankruptcy for what they were doing with the hotel. So to say they weren't involved or they didn't have standing, the case law says it just has to be some injury to a legally cognizable interest. And I think when you have a multimillion dollar development fee that is being moved around in the order by the city and others, when it's being recognized by everybody as belonging to the two of them, which was lost as part of this, and not lost until the hotel was gone, that's certainly a legally cognizable interest. And I've also got the court. The court obviously didn't rule against that. Judge Hoost didn't rule on that and neither did the other judge. Excuse me, Counselor. Yes. I want to go back to your comment on the side letter agreement. You indicated that Mr. Matthews signed that. Yes. Is there anywhere in the amended complaint where a breach of that side letter agreement is alleged? It's not a breach of the side letter. The existence of the side letter is a breach because what we're saying is good faith and fair dealing. They were supposed to reasonably agree to a change in management. We were bringing in FHG, which is a nationally known management corporation. They weren't complaining about FHG, and they weren't complaining of the fact that Marriott was ranking, as we put, lowest, that they would fail their own test. They were the manager and owners of the hotel, and they basically were failing their own metric for whether they were managing it properly. Mr. Matthews asked to change, and they said, oh, you're going to sign this multi-page agreement, which puts in all these requirements, and in fact, as we allege in the complaint, some of the other creditors said, hey, you're interfering with the creditor agreement. You're getting more rights than the prime mortgage holder. The city was taking on more control and observation and reporting requirements that were totally extraneous to what was going on. So we're saying the side letter was, in fact, a breach of the agreement. We're going to follow up on that. Sure. Are there any contracts that are the basis for the complaint that were signed by Gary Matthews or Monty Brannan individually? I went through them. I mean, literally, Matthews had to sign all of the inter-development agreements. But individually and not as agent or as an officer of another entity? Yes. He signed many of these as the sole owner of the corporation, but then further signed paragraphs in those agreements saying that he was personally guaranteeing the conduct of it. So it's like if ABC Corp. signs a contract, but the owners are required to personally guarantee it, they are personally bound by that outside of their corporate role.  He personally guaranteed the mortgage. He was sued as a personal guarantor of the mortgage of the hotel. So he signed numerous documents individually in addition to his corporate role. But you agree his individual role and his corporate role are separate and distinct. I mean, these were all incorporated entities, correct? Yes. It wasn't an individual doing business as, for example. Yes, we dropped corporation claims. What we're focusing on in these tort claims is the development fee and the loss of their ownership interest in the hotel. Because, yes, I agree that, yes, the corporations are a separate issue, but when I personally guarantee my corporate debt, when I personally guarantee a corporate contract, I'm personally involved, and I can be personally sued, and I am individually liable. And that's why Matthews was sued in the bankruptcy court. That's why he went bankrupt, because those personal guarantees drug him into bankruptcy. But are you suggesting that becoming a guarantor makes you an actual party to the contract? You are financially liable if there's a deficiency. For example, and you can be sued, but are you suggesting that makes you a party to the case, or a party to the agreement? Well, yes, I believe that's true, especially when it's here. He was guaranteeing the conduct of the corporation. He was guaranteeing that he was the sole owner of the corporation, and he would manage their actions in accordance with the other agreements, including the intercreditor agreement. So he was not passive. He wasn't sitting back. And, in fact, the side letter seeks to control what Mr. Matthews and Mr. Brannon could pay themselves for managing the hotel. So they weren't just saying, well, the corporations can't do this or that. They were saying, you, Gary Matthews, can't do this. You, Mr. Brannon, cannot do that. So they were trying to restrict them personally, and they personally owned the developer's fee. So that multimillion-dollar nugget was moved around by the city when they forced their way into the case. But at the end of the day, that's what would have been free from the city's claim and the underlying mortgage claim if the refinancing deals went through. So they lost millions of dollars that they had invested in the hotel that was theirs. The city put that back in line, and then when the deal blew up, they lost it completely. And I think that makes them a party. If I have a $7 million interest in the hotel, I think I'm a party to the case. Well, your answer to Justice Leonard's question is essentially that as a guarantor of the project and being intermixed with many assets of the project, somehow your client became a party to the contracts. I think when you sign a contract for the corporation, and then you additionally sign as an individual guaranteeing performance of that contract, you are a party to the contract. He signed those contracts individually as well as in a corporate status. There are paragraphs in there that force him to do things personally, not as a corporation, but as Gary Matthews individually. Monty Brannan's interest. Monty Brannan was brought into this litigation on a side letter which he did not review and did not sign, but it purported to bind him personally. And his interest in the developer's fee was also lost. I don't know where I am on time. I think the only other thing I did not touch on was in this case when we're talking about repetitive torts, in addition to the breaches that we thought occurred on the various agreements. Essentially, when the Deutsche Bank negotiation came in, the city decided it was not going to waive what's called yield maintenance fees, which are normally held by banks or other lenders. Every other commercial lender in the case agreed to that. They would not. We referred to in the complaint the fact that the city council, when the YAM deal was approved, but yet their discussion of the deal was so vitriolic that YAM backed out, one of the city councilwomen said, well, when are we going to own the hotel? It was clear that they had been discussing forcing my clients out and the city getting ownership of the hotel, and the city councilmembers were confused about why aren't we getting the hotel. And I think it's a breach when you're doing an agreement with somebody to approve it, yet say something so horrible against that person that the lender backs out, and that's what happened. The lender was listening, and the lender heard what the city councilpeople were saying, heard what the village attorney was saying, and basically said, we don't want any part of the order, and backed out. And we also alleged in the complaint that they basically cast aspersions during the bankruptcy auction, saying that my clients had committed civil and criminal acts in management of the hotel, which, of course, we're arguing is scared away investors. And again, I want to point out, although we didn't point it out specifically in the brief, that this was a motion for summary judgment. All facts in the complaint are presumed to be true. All inferences from what we alleged in the complaint are presumed to be true, and we believe under those circumstances this case should be reversed, if not from a straight ruling by this court basically saying there was a question of fact on all these issues, for the trier of fact, and it was premature to dismiss based on the pleadings in this case without discovery. Thank you. Thank you, counsel. Ms. Nair? Thank you. And may it please the court and counsel, again, my name is Jonah K. Nair. I'm here for the city of Peoria and former mayor-artist. With me today is Patrick Hayes, who is the current city attorney for the city as well. To just very briefly address one point raised by Mr. Ryan in regard to the law of the case issue, I think he said surely if we would have sought a 304A finding on Judge Hoose's denial of our motion to dismiss, that would have been appealed. Well, quote, the denial of a motion to dismiss is not a final and appealable order. It just isn't. The law of the case doctrine is crystal clear. The law of the case doctrine binds the court only where its prior order was final and appealable. That's the Roy v. Cohn case. I'll leave it at that. What you didn't hear in Mr. Ryan's presentation is what the actual causes of action are that are before the court. There are two counts. Count number three, which is for tortious interference with contract, and count number four, which is tortious interference with business expectancy. Starting with tortious interference with contract, the first element that needs to be established and alleged is the existence of a valid and enforceable contract between the plaintiff and another. And as this court has honed in on, there are no contracts at issue that were allegedly tortiously interfered with between these plaintiffs and anyone else. Looking at the documents that are actually attached to the amended complaint, the only document to which Mr. Matthews is a party is the side letter agreement. And that document, no breach is alleged to have occurred. So just the very fundamental first question, what contracts are we talking about? They're not parties to any of these contracts. The question of the side letter and whether the existence of the side letter in and of itself is an injury, we'll get to in a moment. Turning to the valid business expectancy question, the elements of a tortious interference with a business expectancy are that, number one, the plaintiff has a valid business expectancy. And this is the Madonna versus Giacobbe case. They have alleged that there were some business expectancies in the air, that there was the potential Deutsche Bank refinancing and the potential YAM refinancing. The plaintiffs, we have no evidence that the plaintiffs would have been parties to those refinancings individually. Exhibit F to the amended complaint, which is the subordination intercreditor agreement, which is the one sort of indoor-level document that we have here, shows that Matthews and Brennan, Mr. Matthews and Mr. Brennan were not parties to that agreement. There's no evidence that they would have been parties to that refinancing. Now, on the appeal, the plaintiffs have really tried to focus, I think to avoid the statute of limitations result, on this allegation that somehow there was ongoing bad acts that interfered with potential future business expectancies other than the Deutsche Bank and YAM refinancings. Well, setting aside the question of whether a city's filings in litigation or statements by city councilmen are really actionable, they simply haven't alleged what those other business expectancies could possibly have been. And I'll quote from the Romanek versus Connolly case, 324 Illinois Appellate 3rd Reporter 393 at 406, the element of purposeful or intentional interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy of entering into a valid business relationship with an identifiable third party. Well, the only identifiable third parties with whom the hotel LLCs anticipated having a business relationship are Deutsche Bank and YAM. So, turning to those timings, the timings of these alleged interference actions, and again, interfering with contracts, interfering with specific valid business expectancies identified in the complaint. The first they talk about is the demand for concessions, if you will, or enforcement of our contract rights, as we would characterize it under the development agreement. Well, the side letter agreement, which Mr. Ryan has just explained to this court, was the result of the alleged bad act, was signed on July 1st of 2014, so quite some time ago. The next item is the refusal to agree to the Deutsche Bank refinancing. Deutsche Bank pulled the plug on the offer on January 3rd of 2017. That's in the complaint at paragraph 81. Finally, the YAM refinancing, the alleged city council's statements and so on that caused supposedly the end of the YAM refinancing. YAM canceled its term sheet and offer on February 10th of 2018. This complaint, the first complaint in this case, was filed more than a year after that last event. Therefore, this action is barred by the statute of limitations under the Tort Immunity Act. Turning to the standing issue that the court has identified to, I mean, this one is this, again, Judge Brown at the trial court level didn't reach this issue because he found that the action was barred under the statute of limitations. But, we found that even in my recitation of what's in the counts, it's just baked into the problems with counts 3 and 4 of the amended complaint. There simply are not contracts alleged between Mr. Matthews and Mr. Brannan as individuals and any of these alleged counterparties with whom contracts or business expectancies were breached or allegedly tortiously interfered with. So, for that reason, because it was our feeling the court was going to effectively have to consider standing even to analyze this case, we did want to bring that to the court's attention as well. Your Honor, just to briefly address the cases that Mr. Ryan noted, I think we both would agree that the Ravenswood case is probably the most on point and that case we believe demonstrates exactly what we're talking about where Mr. Ryan is compounding the injury that starts the clock on the statute of limitations versus the eventual damages that might have been caused by that injury. In that case, the city constructed a subway under a piece of property improperly without an easement. It was the construction of that subway that started the clock on the statute of limitations, even though they didn't start operating for four years after. It's that initial, it's the moment when interest is when Yam canceled the term sheet, when Deutsche Bank canceled the term sheet, and going back even farther, when the side letter agreement was executed. Again, we don't believe any of these are actually tortious acts, but even assuming they were, those are the injuries that are pled in the amended complaint. So, Your Honors, unless you have questions for me, that's all I have. No questions. Thank you very much. Mr. Ryan? Yes. Your Honors, first, I went back and went back to the complaint again, and I can cite paragraphs, but we pointed out in the first redevelopment agreement that was terminated by the city with no cause. When they were threatened with a $7 million suit, they came back to the negotiating table. When they came back to the negotiating table, that's when they reinserted themselves in the second amended agreement by forcing themselves ahead of other creditors, and we specifically said this was a breach of the contract in that they took bonds and converted them to a second mortgage against our will, but essentially saying we'll blow up the project if you don't do it. That's a breach of good faith and fair dealing any way you slice it. They had a gun to our head at each of these transactions. We point out that the city's in second position behind the primary lenders basically angered all the other creditors. There were a lot of angry people at the city of Peoria at this point. Again, the city threatened to terminate the contract if they didn't get their way in this. The suborder and inter-credit agreement, which I alleged, it points out that nobody will threaten to terminate a mortgage, terminate an agreement that will jeopardize the other parties without the prime lender's agreement. They were doing all of this without the prime lender's agreement. After the new entities for the hotel were created, we talk about the side letter. The side letter, as I said, had a good faith and fair dealing provision in it, and they used that side letter again and again. As I've said, the side letter was a gun to the head kind of thing, but they used the side letter against Mr. Matthews, against Mr. Brandon to insist on all kinds of reporting that they were not required to do to anyone else. And by the way, this is Mr. Matthews and Mr. Brandon that are asking to do this accounting, not the corporations. As I say in paragraph 56, the city's position on the side letter breached the terms of the management agreement and assignment of the management agreement, and breached the terms of the inter-credit agreement that basically was threatening to derail the entire project that the demands were met. By the way, I want to make a point on Ravenswood while I think about it. Ravenswood, it was not the start of the construction that triggered the statute. If you read that case carefully, it was when they were constructing without the right to do so. In other words, they had an easement to construct, and during that period there could be no suit because it was not wrongful. The minute they operated outside of their easement, the minute their easement expired and they continued to do that, that's what triggered the statute. But again, a number of wrongful acts in Ravenswood preceded that operation outside of their easement which does not destroy our point in that respect. I want to point out that with the Deutsche Bank deal, we allege in this complaint that when Mayor Artis was asked to do what every other lender was doing here and had the city wait, it's punitive interest, it's the extra interest that banks get when you cancel a contract early. When all the other banks were doing that, the mayor said, I'm not going back to the city council with that because it would be political suicide. That's a wrongful act. He has to take that negotiating back to the city council and have the city council vote on it. He personally interfered with the ability of the city to have a vote on whether or not to do that to salvage their mortgage because as we told them, the hotel was going to go bankrupt if they didn't get this relief through Deutsche Bank, which in fact happened when this deal fell through. The hotel was being forced into bankruptcy by the city and by the prime lender. Back to Sandy, can you share your best argument that your client was personally a party to any of the contracts that were addressed in the complaint? You have to go back to the fact that the corporations that he was signing on behalf of, for the most part, were created corporations solely for the purpose of the historic tax credits. There were no other shareholders. Gary Matthews was the sole owner, investor, and shareholder of those corporations. These were shell corporations created for a specific purpose. EM Properties was his holding company. That's one that's listed in here. That is the company that he personally owns 100% of and that's where he routes all his management contracts through. Again, he's the 100% owner, 100% shareholder, and it is an LLC. He basically owns that. That's also where the developer's fee would ultimately be paid. I go back to his interest in the developer's fee. That was not owned by a corporation. That was owned by Mr. Matthews and Mr. Brannon personally. They had a $7 million interest in this hotel as investors and developers, which they were asked over and over at the negotiating table to subordinate or change their position on while the city was interfering over and over with these agreements, angering other creditors, angering the prime mortgage holder, angering our people, but doing so with the threat of canceling the contract. Thank you, Counselor, for answering my question. Are there any other questions? You are out of time. Yes, if I could. As it relates to the bankruptcy, you indicated that both of the plaintiffs individually filed. Is that correct? They were forced to file, yes. Okay. Do you know if that was a 7, a 13, or 11 individually and were they discharged? Ultimately, what I guess I'm trying to get to is, is there a bankruptcy trustee that's involved or were you permitted to continue with this litigation outside of the bankruptcy? This litigation was initiated with the permission of the bankruptcy trustees. However, Mr. Matthews has now been discharged. He got a discharge. Mr. Brannon's discharge was held up because he had other assets. That answers my question. I was just looking to confirm that that authority had existed. Yes, I have authority to file this case. Thank you. Thank you, Counsel. Thank you both.